TUCKER ELLIS LLP
Carmen A. Trutanich - SBN 86629
carmen.trutanich@tuckerellis.com
William H. Dance - SBN 230041
william.dance@tuckerellis.com
515 South Flower Street
Forty-Second Floor
Los Angeles, CA 90071
Telephone:     213.430.3400
Facsimile:      213.430.3409

Attorneys for Plaintiff PEPÉ'S, INC.,
a California corporation dba Pepé's Towing

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

# EASTERN DIVISION

| | |
|---|---|
| PEPE'S, INC., a California corporation dba Pepé's Towing<br><br>Plaintiff,<br><br>v.<br><br>CITY OF SAN BERNARDINO, charter city organized under the laws of the State of California; VIRGINIA MARQUEZ, an individual, BENITO J. BARRIO, an individual, JOHN VALDIVIA, an individual, FRED SHORETT, an individual, BESSINE L. RICHARD, an individual, JAMES L. MULVIHILL, an individual, R. CAREY DAVIS, an individual, JARROD BURGUAN, an individual, PAUL WILLIAMS, an individual, GARY D. SAENZ, an individual, JOLENA GRIDER, an individual, ANDREA MILLER, an individual, also known as ANDREA TRAVIS MILLER, MARK SCOTT, an individual, and DOES 1-10<br><br>Defendants. | Case No.<br><br>**COMPLAINT FOR CIVIL RIGHTS VIOLATIONS AND CONSPIRACY TO DENY CIVIL RIGHTS**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff, PEPÉ'S, INC., a California corporation dba Pepé's Towing Service.

("Pepé's"), by and through its undersigned counsel, sues Defendant the City of San

1388656.2

TUCKER ELLIS LLP

Chicago ♦ Cleveland ♦ Columbus ♦ Houston ♦ Los Angeles ♦ San Francisco ♦ St. Louis

Bernardino ("City") and, in their official and individual capacities, Individual Defendants Virginia Marquez, Benito J. Barrio, John Valdivia, Fred Shorett, Bessine L. Richard, and James L. Mulvihill ("City Council Defendants"), Jarrod Burguan and Paul Williams ("Police Department Defendants"), Gary D. Saenz and Jolena Grider ("City Attorney's Office Defendants"), and Andrea Miller, also known as Andrea Travis Miller and Mark Scott ("City Manager Defendants"), and states as follows:

## JURISDICTION AND VENUE

1.     This action arises under the Fifth and Fourteenth Amendments of the United States Constitution; Article 1, sections 2 and 7 of the California Constitution; and federal statutes, including 42 U.S.C. §§ 1983, 1985, 1986; the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1965, and 28 U.S.C. § 1331.  Venue is proper in the Central District because all the events and omissions giving rise to the claim occurred in this District.

## IDENTITY OF PARTIES

2.     Plaintiff Pepé's, Inc. is a corporation organized and existing under the laws of the State of California, with its principal place of business in the State of California. Pepé's, Inc. does business as Pepé's Towing Service.

3.     Defendant City of San Bernardino ("City") is, and at all relevant times was, a municipal corporation, a charter city in San Bernardino County, California, organized under and existing by virtue of the laws of the State of California.  The City is governed by a City Council with seven members and a Mayor.  The City Council is referred to as the City Council in the operative charter, but as the Common Council in many municipal ordinances.  It will be referred to as "City Council" throughout this Complaint.  The City Council members and Mayor are City employees who are individual Defendants.

4.     Defendant Virginia Marquez is a current City Council member and, on information and belief, is a citizen of California.  She has been a City Council member since March 1, 2010.

TUCKER ELLIS LLP

Chicago ♦ Cleveland ♦ Columbus ♦ Houston ♦ Los Angeles ♦ San Francisco ♦ St. Louis

5.      Defendant Benito J. Barrio is a current City Council member and, on information and belief, is a citizen of California.  On information and belief, he has been a City Council member since March 3, 2014.

6.      Defendant John Valdivia is a current City Council member and, on information and belief, is a citizen of California.  He was formerly the Mayor Pro Tempore.  On information and belief, he was elected to the City Council in November 2011.

7.      Defendant Fred Shorett is a current City Council member and, on information and belief, is a citizen of California.  On information and belief, he was elected to the City Council in March, 2009.

8.      Defendant Bessine L. Richard is a current City Council member and, on information and belief, is a citizen of California.  On information and belief, she was elected to the City Council in February 2016.

9.      Defendant James L. Mulvihill is a current City Council member and, on information and belief, is a citizen of California.  On information and belief, he was elected to the City Council on November 5, 2013.

10.      Defendants Marquez, Barrio, Valdivia, Shorett, Richard, and Mulvihill were all Councilmembers on April 8, 2016 when the Council approved Resolution No. 2016-73.  As City Council members, they were the officials responsible for legislating and setting the policies of the City of San Bernardino.  The Councilmember Defendants named above at all relevant times authorized, and/or ratified the actions of the other City employees, agents, and officials as alleged herein.

11.      Defendant R. Carey Davis is the currently Mayor of the City and, on information and belief, is a citizen of California.  He has been Mayor since 2014.  As the Mayor of the City of San Bernardino, Mayor Davis was the official responsible for setting and enforcing the policies, customs, and practices of the executive departments of the City in enforcing the laws and carrying out the directions of the City Council.  Mayor

TUCKER ELLIS LLP

Chicago ♦ Cleveland ♦ Columbus ♦ Houston ♦ Los Angeles ♦ San Francisco ♦ St. Louis

1388656.2

Davis at all relevant times directed, supervised, authorized, and/or ratified the actions of the City's executive employees, agents, and officials as alleged herein.

12.     Defendant Jarrod Burguan is currently the Police Chief of the City and, on information and belief, is a citizen of California.  On information and belief, he became Police Chief in December 2013.  As the Chief of the City of San Bernardino Police Department, Chief Burguan was the official responsible for setting and enforcing the policies, customs, and practices of the Police Department in enforcing the laws and carrying out the directions of the City Manager and City Council.  Chief Burguan at all relevant times directed, supervised, authorized, and/or ratified the actions of the Police Department's employees, agents, and officials as alleged herein.

13.     Defendant Paul Williams is a Captain in the City's Police Department and, on information and belief, is a citizen of California.  At all relevant times Captain Williams was an employee, agent, and official of the City of San Bernardino Police Department and therefore of the City of San Bernardino.

14.     Defendant Gary D. Saenz is City Attorney in the City and, on information and belief, is a citizen of California.  On information and belief, he was elected to the City Attorney position on November 5, 2013.  At all relevant times Gary Saenz was the City Attorney for the City of San Bernardino.  As the City Attorney, Gary Saenz was the official responsible for setting and enforcing the policies, customs, and practices of the City Attorney's Office in enforcing the laws and carrying out the directions of the City Manager and City Council.  Gary Saenz at all relevant times directed, supervised, authorized, and/or ratified the actions of the City Attorney's Office's employees, agents, and officials as alleged herein.

15.     Defendant Jolena Grider is Chief Deputy City Attorney in the City and, on information and belief, is a citizen of California.  At all relevant times Chief Assistant City Attorney Grider was an employee, agent, and official of the City of San Bernardino City Attorney's Office and therefore of the City of San Bernardino.

COMPLAINT

1388656.2

TUCKER ELLIS LLP

Chicago ◆ Cleveland ◆ Columbus ◆ Houston ◆ Los Angeles ◆ San Francisco ◆ St. Louis

16.     Defendant Andrea Miller, also known as Andrea Travis Miller, is City Manager in the City and, on information and belief, is a citizen of California.  On information and belief, she became City Manager in August, 2017.  As the City Manager, Andrea Miller was the official responsible for setting and enforcing the policies, customs, and practices of the City Manager's Office in running the City and carrying out the directions of the City Council.  From August, 2017 to the present, Andrea Miller directed, supervised, authorized, and/or ratified the actions of the City Manager's employees, agents, and officials and other City employees, agents, and officials, as alleged herein.

17.     Defendant Mark Scott is the former City Manager in the City and, on information and belief, is a citizen of California.  On information and belief, he became City Manager in February, 2016.  As the City Manager, Mark Scott was the official responsible for setting and enforcing the policies, customs, and practices of the City Manager's Office in running the City and carrying out the directions of the City Council.  From February, 2016 to August, 2017, Mark Scott directed, supervised, authorized, and/or ratified the actions of the City Manager's employees, agents, and officials, and officials and other City employees, agents, and officials, as alleged herein.

18.     Doe Defendants 1-10 are sued under fictitious names, as Plaintiff is ignorant of the true names of the Doe Defendants.  Once the identity of these parties has been established, Plaintiff will substitute the Doe Defendants' true names.  All the Doe Defendants are past or present employees of the City.  Plaintiff believes it will be able to identify the Doe Defendants through discovery of City documents and through depositions revealing the involvement of specific Police Department, City Attorney's Office, and City Manager's Office City employees who were actors involved in the misconduct alleged in this Complaint.

## **FACTUAL BACKGROUND**

19.     Plaintiff Pepé's, Inc. dba Pepé's Towing Service ("Pepé's") at all times relevant to the Complaint, was, and is, a towing business.  Pepé's has been in business for over 30 years, operating over 75 heavy, medium, and light duty trucks.  Pepé's location

TUCKER ELLIS LLP

Chicago ♦ Cleveland ♦ Columbus ♦ Houston ♦ Los Angeles ♦ San Francisco ♦ St. Louis

1388656.2

TUCKER ELLIS LLP

Chicago ♦ Cleveland ♦ Columbus ♦ Houston ♦ Los Angeles ♦ San Francisco ♦ St. Louis

in the City of San Bernardino is 1303 East Victoria Avenue.  This location was opened in 2000.  The San Bernardino location has a large indoor storage facility in addition to a fully paved outside yard with a storage capacity of over 300 vehicles, all fully secured with a continuously operating security system and bright security lighting.  Pepé's also operates ten other locations around Southern California.

20.    Manuel Acosta is part-owner and president of Pepé's.  His parents, Jose and Delfina Acosta, established Pepé's in 1978.  Manuel joined the business in 1987.

21.    Pepé's tow trucks include super heavy-duty trucks that can tow 18-wheeler tractor-trailer rigs as well as trucks that can recover vehicles in a variety of challenging situations, and an extensive range of medium and light-duty tow trucks.

22.    As soon as Pepé's started operating its yard at 1303 East Victoria Avenue in the City of San Bernardino in 2000, Manuel Acosta immediately inquired with the City regarding the possibility of contracting with the City and joining the towing rotation.  At that time, as at the present time, Pepé's was a rotation tow contractor for many cities in San Bernardino, Riverside, and Los Angeles Counties, as well as with the County of San Bernardino and the California Highway Patrol.

23.    When it had a special need, the City contacted Pepé's and asked it to handle complex and heavy-duty tows and operations that the rotation tow contractors were not able to handle because they lacked the heavy-duty equipment and expertise, but never included Pepé's on the tow rotation.

24.    At all relevant times, the City Council has been the legislative body that governs the City.

25.    At least since 1995, the City has contracted with 5 to 6 private tow companies to provide vehicle towing and storage services in connection with vehicle tows ordered by the City, through the Police Department as well as through code enforcement.  The City divides its calls evenly among the contracted towers in a practice commonly referred to as the "tow rotation."  In this Complaint, the companies contracting with the City at any given time to be part of the rotation are referred to as

1388656.2

"rotation tow contractors" unless quoting a document referring to them in other ways, *e.g.* "tow carriers."

26.     The City rotation tow contracts are governed by resolutions adopted by the City Council setting forth the number of private tow companies that will be granted contracts, the requirements that will be imposed by the contracts, the procedure for award of contracts, and other terms and conditions.

27.     The City Council is authorized by the current City Charter, which was voted into law in 2016, to contract services such as towing.  The City Council was also authorized under the previous City Charter to contract services such as towing.

28.     The contents of the resolutions and contracts through which the City Council contracts with the rotation tow contractors have changed over the years, though several key provisions have remained the same.

**Resolution No. 2005-286**

29.     On August 15, 2005 the San Bernardino City Council adopted Resolution No. 2005-286 purporting to define and govern the relationships between the City and the rotation tow contractors.  Resolution No. 2005-286 repealed its predecessor.  Resolution No. 2005-286 has been amended but not repealed.  Resolution No. 2005-286, with its Exhibit A, is filed concurrently with the Complaint as Exhibit 1.

30.     None of the resolutions prior to Resolution No. 2005-286, nor the contracts based on them, have any relevance to the claims in this Complaint, except that each required the rotation tow contractors to maintain outside storage space for at least 200 vehicles, to provide a certain amount of inside storage, and to provide a secure environment to protect the towed vehicles and their contents.

31.     Under Resolution No. 2005-286, the City contracted with six tow companies – Tri-City Towing, Danny's Towing, City Towing, Wilson Towing, Big Z Autoworks, and Hayes Towing.

32.     Resolution No. 2005-286's paragraph L required all rotation tow contractors to "[c]omply with all rules, regulations and laws of the state, county, and City."

TUCKER ELLIS LLP
Chicago ◆ Cleveland ◆ Columbus ◆ Houston ◆ Los Angeles ◆ San Francisco ◆ St. Louis

1388656.2

33.     Resolution No. 2005-286 provided at page 6 that "[n]o towing carrier is exempt from meeting legal requirements imposed by any city, county, State or Federal laws or regulations.  An example of this is the Clean Water Act."

34.     Resolution No. 2005-286 required each rotation tow contractor to maintain a yard large enough to store 200 vehicles, with inside storage for a minimum of 12 spaces.

35.     Resolution No. 2005-286 required that outside yards be adequately lighted.

36.     Resolution 2005-286 required the rotation tow contractors to "store towed vehicles in a safe and protected space where the vehicles and their contents will not be accessible to thieves nor be damaged by activity in the carrier establishment or from the elements or by vandals; no vehicles shall be left parked or stored on the public streets at anytime."

37.     The provisions of Resolution No. 2005-286 discussed in the preceding 5 paragraphs have remained in force to the present day by virtue of their incorporation into subsequent Resolutions and contracts.

38.     Resolution No. 2005-286 specified requirements for existing rotation tow contractors.  Resolution No. 2005-286 also specified a somewhat different set of requirements, set forth in "Exhibit 'A'," that applied to "[e]very towing carrier that becomes part of the City tow rotation after the adoption of this Resolution" as well as "to towing carriers under new ownership that apply to join the City rotation after a change of ownership occurs at that towing carrier."

39.     A key difference between the requirements for the existing rotation tow contractors and new tow contractors under Resolution No. 2005-286 was the minimum size of the outside storage yard required of the contractor.  For existing rotation tow contractors, Resolution No. 2005-286 required storage space sufficient for 200 vehicles but did not set forth a specific square footage requirement.  New rotation tow contractors, on the other hand, were required to have sufficient storage space for 200 vehicles and a minimum outside storage yard 65,000 square feet in size.

TUCKER ELLIS LLP

Chicago ♦ Cleveland ♦ Columbus ♦ Houston ♦ Los Angeles ♦ San Francisco ♦ St. Louis

1388656.2

40.    Resolution No. 2005-286 granted the six existing rotation tow contractors a "grandfather" exception to the tow contractor requirements stated in Exhibit A.

41.    Under Resolution No. 2005-286, all contracts were terminable by the City or the rotation tow contractor on 30 days' written notice.

42.    Resolution No. 2005-286 provided that sale or transfer of a controlling interest in a rotation tow contractor immediately terminated the Agreement for Tow Services for that contractor, creating an open position in the tow rotation. The open position on the tow rotation would be opened for application by the new entity created from the sale or transfer of controlling interest in the existing rotation tow contractor if the new entity wished to apply, but would also be open for application by other qualified carriers.

43.    Resolution No. 2005-286 provided that if the purchaser of an existing rotation tow contractor were awarded the open tow position on the rotation, the purchaser would have to comply with the requirements for new rotation tow contractors, including the requirement for a 65,000 square foot outside storage yard. If the position were instead awarded to a new tower, that new rotation tow contractor would also have to have to meet the 65,000 square foot outside storage yard requirement.

44.    The City amended Resolution No. 2005-286 in 2008 with Resolution No. 2008-347, in 2010 with Resolution No. 2010-28, and in 2011 with Resolution No. 2011-34. Each of these resolutions modified the franchise fee that the existing rotation tow contractors were required to pay to the City but did not modify other provisions of Resolution No. 2005-286, which remained in force as amended.

**Resolution Nos. 2011-80 & 2011-91**

45.    On April 5, 2011 the San Bernardino City Council adopted Resolution No. 2011-80 which purported to authorize the City Manager to execute new "Agreement for Tow Services" contracts with the six existing rotation tow contractors. Resolution No. 2011-80, with its Exhibit A, is filed concurrently with this Complaint as Exhibit 2.

TUCKER ELLIS LLP

Chicago ♦ Cleveland ♦ Columbus ♦ Houston ♦ Los Angeles ♦ San Francisco ♦ St. Louis

COMPLAINT

1388656.2

TUCKER ELLIS LLP

Chicago ♦ Cleveland ♦ Columbus ♦ Houston ♦ Los Angeles ♦ San Francisco ♦ St. Louis

46.     The new "Agreement for Tow Services" contracts, which were executed by the City and each of the existing rotation tow contractors soon after Resolution No. 2011-80 was passed by the City Council, contained significant changes from the prior contracts.

47.     First, the provision that automatically terminated an Agreement for Tow Services upon sale of or transfer of a controlling interest in an existing rotation tow contractor was removed.

48.     Second, the provision that required the purchaser of an existing rotation tow contractor or controlling interest in that entity to compete with new applicants for a position on the rotation was deleted.

49.     Third, the provision that required the purchaser of an existing rotation tow contractor or controlling interest in that entity to have a 65,000 square foot outside storage yard was deleted.

50.     These provisions were replaced with language that permitted assignment of an existing tow contract upon sale of the tow contractor company and upon approval of the City Council.  The change conferred an economic benefit on the existing rotation tow contractors because they could now sell their businesses with a stronger likelihood that the purchaser could step into their shoes and assume the existing rotation tow contract with the City of San Bernardino without being required to have a 65,000 square foot outside storage yard and without necessarily competing with new candidates to join the rotation.

51.     In addition, Resolution No. 2011-80 replaced the 30 day termination provision in Resolution No. 2005-286 with a five-year term.

52.     The new rotation tow contracts incorporated Exhibit A which carried forward from Resolution No. 2005-286 the scheme whereby new rotation tow contractors had to meet different, more stringent requirements than the 6 existing rotation tow contractors had to meet.  Exhibit A, which did not apply to existing rotation tow

COMPLAINT

1388656.2

1  contractors, required minimum outside storage space of 65,000 square feet, with room for

2  at least 200 vehicles, among other requirements.

3      53.    Each of the existing tow carriers executed a contract based on Resolution

4  No. 2011-80, effective as of April 4, 2011.

5      54.    On April 19, 2011the City Council approved Resolution No. 2011-91 which

6  further amended Resolution No. 2005-286.  Resolution No. 2011-91 is filed concurrently

7  with this Complaint as Exhibit 3.

8      55.    Resolution No. 2011-91 deleted the grandfathering provision of Resolution

9  No. 2005-286 stated on page 7 of the latter document.  That provision actually required

10  the purchaser of an existing rotation tow contractor to meet the more stringent

11  requirements stated in Exhibit A, so its deletion actually clarified that the buyer of an

12  existing rotation tow contractor or controlling interest in one would <u>not</u> be required to

13  demonstrate that it had an outside storage yard of at least 65,000 square feet.

14      56.    Resolution No. 2011-91 also required provisions for inside vehicle storage,

15  which was already required in prior resolutions, as well as secure inside evidence storage,

16  which was new.  It also required rotation tow contractors to photograph vehicles and their

17  contents prior to taking possession and upon release to document the condition of the

18  vehicle and its contents, another new provision.

19  **<u>Tow Contracts Expired in 2016 But Were Extended to 2021.</u>**

20      57.    Upon the expiration of the five-year term of the 2011 contracts, the City

21  Manager recommended that the City Council extend the existing contracts for no more

22  than one year on a month-to-month basis to provide basic fairness to all tow contractors

23  in the process, to give the City an opportunity to provide notice of a planned bidding

24  process for towing vendors, and to explore the cost/benefit of the City operating its own

25  tow yard.  On information and belief, then-City Manager Mark Scott made this

26  recommendation to the City Council Ways and Means Committee on March 9, 2016.  On

27  information and belief, then-Deputy City Manager, Andrea Travis, now City Manager,

28  concurred.

TUCKER ELLIS LLP

Chicago ♦ Cleveland ♦ Columbus ♦ Houston ♦ Los Angeles ♦ San Francisco ♦ St. Louis

11

1388656.2

58.     But instead of opening up the competition to new towers based on fairness, merit, and qualifications, on April 4, 2016, upon the expiration of the five-year term of the 2011 contracts, the City Council passed Resolution No. 2016-73, which extended the existing six rotation tow contractors' contracts for another five years without competitive bidding or any other opportunity for the consideration of any towing contractors other than the existing set of six.  By this point, the rotation tow contractors' contracts had been renewed in 2005, 2011, and now 2016, without opening the rotation to any other tow companies.  By this point, Pepé's had sought the opportunity to compete for a position in the towing rotation in 1995, 2005, 2011, and 2016, without success and without being provided any explanation as to why the City decided to continue to contract only with the group of six rotation tow contractors with whom it had previously contracted.  Resolution No. 2016-73 was filed concurrently with the Complaint as Exhibit 4.

### Pepé's Presented Evidence of Noncompliance by Existing Towers

59.     Pepé's requested a complete set of all available records of inspections conducted by City to determine the extent to which the rotation tow contractors were complying with the terms of their contracts.  Documents obtained by Pepé's from the City of San Bernardino revealed that the City of San Bernardino Police Department had not preserved, or at least had not produced, a complete set of inspection and assessment records.  Taken together, the inspection documents produced by the City for the period 2011-2016 suggest that the City's inspections of the six rotation tow contractors for compliance with contract requirements were haphazard, incomplete, and careless.

60.     On February 24, 2017, Pepé's presented a report in the form of a letter to a number of officials in the City of San Bernardino government (the Legislative Review Committee, Mayor Pro Tempore John Valdivia, and City Manager Mark Scott) in which it alleged that none of the six then-current rotation tow contractors were in full compliance with the terms of their contracts.

61.     Pepé's brought to the City's attention the fact that all six rotation tow contractors – Big Z Autoworks, City Towing, Danny's Towing, Hayes Towing, Wilson

12

1388656.2

Towing, and Tri-City Towing – stored towed vehicles on unpaved and permeable surfaces.  Discharges from standing vehicles onto unpaved surfaces violate City of San Bernardino Municipal Code §§ 13.32.305 (M) and 13.32.305 (X).  Parking vehicles on an unpaved surface violates City of San Bernardino Municipal Code §§ 10.16.240 and 10.16.250.  This conduct also violated Paragraph 3(a) of the tow service agreements.  This was also a violation of Resolution No. 2005-286, as amended, on page 6, of the provision stating "[n]o towing carrier is exempt from meeting legal requirements imposed by any city, county, State or Federal laws or regulations.  An example of this is the Clean Water Act."  The fact that these rotation tow contractors did not have impermeable surfaces meant they were violating all these laws, regulations, and contract provisions on a constant basis.

62.     Pepé's pointed out to the City that because all the then-current rotation tow contractors except for Tri-City Towing could not legally park stored vehicles on unpaved surfaces, including gravel surfaces, only Tri-City Towing could legally comply with the requirement that it be able to store 200 vehicles outdoors.

63.     At that time, five of the six rotation contract towers did not have outside storage yards of at least 65,000 square feet.  Only Tri-City Towing had an outdoor storage yard size equaling or exceeding 65,000 square feet.

64.     Once Pepé's exercised its protected free speech rights by making these allegations to the City of San Bernardino, the individual defendant City employees conspired to conceal the lack of compliance by the existing rotation tow contractors and the lack of inspection and enforcement by the City of San Bernardino Police Department, as well as to punish Pepé's and retaliate against it for bringing the noncompliance, non-inspection, and non-enforcement to the attention of other City employees and into the public eye.  The ultimate goal of this conspiracy was to silence Pepé's and retaliate against it for its free speech by ensuring it would not be fairly evaluated for a spot in the towing rotation and by requiring it to meet conditions that lacked rational basis, denying it equal protection.

TUCKER ELLIS LLP

Chicago ♦ Cleveland ♦ Columbus ♦ Houston ♦ Los Angeles ♦ San Francisco ♦ St. Louis

65.     The Police Department individual defendants, embarrassed that the Department had been caught doing such a poor job of inspection and contract enforcement, redoubled their efforts to conceal the rotation tow contractors' noncompliance by continuing to report that the Department had properly inspected the tow facilities all along and that all contractors' facilities complied with their contracts.

66.     On March 2, 2017 the San Bernardino Police Department supposedly again inspected all six rotation tow contractors.

67.     The inspection forms used by the Police Department to document their March 2, 2017 inspections do not mention or reference paved impenetrable surfaces. They have no evaluations whether the tow contractors met the requirements stated in Resolution No. 2011-91 of secure evidence storage, secure indoor storage of vehicles on request of the Police Department, or a capability to digitally photograph vehicles to document their contents and conditions upon receipt and just prior to release.

68.     The omissions and inaccuracies of the 2017 inspection forms confirm the haphazard, careless, incomplete nature of the Police Department's inspections, continuing a practice the Police Department had engaged in at least since 2011 and the efforts of the Police Department employee defendants to conspire to deny Pepé's a position as a rotation tow contractor.

69.     On March 8, 2017 Police Chief Burguan delivered a written report, purportedly written by Police Captain Paul Williams, in which the Chief stated that all towers were in compliance with their contract terms, based on the results of the March 2, 2017 inspections.  However, as noted, there were many omissions in the scope of the March 2, 2017 inspections, so it is not credible that Chief Burguan's written report was based on actual inspections that evaluated the rotation tow contractors' facilities against the actual requirements stated in Resolution No. 2005-286 as amended.  Chief Burguan and Captain Williams' letter is a further action in the City's and the Police Department defendants' conspiracy to deny Pepé's a spot as a rotation tow contractor.

TUCKER ELLIS LLP

Chicago ♦ Cleveland ♦ Columbus ♦ Houston ♦ Los Angeles ♦ San Francisco ♦ St. Louis

COMPLAINT

70.     On August 23, 2017 Pepé's wrote to the City of San Bernardino renewing its contention that existing rotation tow contractors were not in full compliance with their contract terms.  The City of San Bernardino did not respond to the letter.

71.     On October 2, 2017 Pepé's sought a meeting with City officials to discuss the existing rotation tow contractors' non-compliance with contract terms and its desire to be added to the tow rotation.

72.     On October 19, 2017 Chief Assistant City Attorney Jolena Grider responded.  She told Pepé's the City Manager had determined that there were no openings on the existing tow rotation but that the City intended to open up the tow rotation to all qualified carriers upon the expiration of the term of the existing tow contracts in 2021.

73.     On October 20, 2017 Pepé's wrote Assistant City Attorney Grider.  Pepé's reiterated its position that the City of San Bernardino had not been enforcing the contract terms agreed to by existing carriers.  Petitioner further stated that if the City had been enforcing the contract terms, there would be an opening on the tow rotation to which Pepé's could apply.

74.     On November 10, 2017 Pepé's formally appealed to the City Council the City Manager's determination that no vacancy existed on the tow rotation due to breaches of the city's tow rotation agreement.

75.     On November 13, 2017, Chief Assistant City Attorney Grider affirmed, in writing to Pepé's counsel James Penman, that "[a]ll of the tow carriers are currently in compliance and the Police Department has not found any violations that would warrant removal from the tow rotation list."  Ms. Grider explained in the letter that the inspections she based her assessment on were the March 2, 2017 inspections of all six rotation tow contractors by the Police Department.

76.     The City Manager's position, as related by Ms. Grider, was based on the knowingly false statements by Police Department defendants Captain Williams and Chief Burguan that the existing rotation tow contractors were all in compliance with their

COMPLAINT

1388656.2

TUCKER ELLIS LLP

Chicago ♦ Cleveland ♦ Columbus ♦ Houston ♦ Los Angeles ♦ San Francisco ♦ St. Louis

1   contracts.  That the Police Department could make such statements at this point shows a

2   deliberate unwillingness by Police Department defendants to properly inspect the

3   contractors' yards and facilities.  Ms. Grider was herself familiar not only with Pepé's

4   allegations but of the factual support Pepé's provided for those allegations, so she too had

5   to have been aware, based on presentations Pepé's had made to her, that the Police

6   Department's statements were deliberately false.  In stating that the City had no openings

7   on the existing rotation, she ratified the Police Department's conduct and joined the

8   conspiracy.

9       77.    On January 10, 2018, Pepé's representatives met with the City Manager, the

10  Police Chief and representatives of the City Attorney's office to present further

11  irrefutable photographic evidence of noncompliance with contract requirements for

12  security fencing, night lighting, pavement surfaces and yard size by existing towers.

13      78.    On February 8, 2018, Pepé's counsel asked Ms. Grider, via e-mail, "where

14  and in which document the language grandfathering in the size of the yards is located."

15      79.    Ms. Grider responded that "Resolution 2005-286 contains language that

16  grandfathers the existing carriers [sic] yard sizes.  This agreement was continued by

17  Resolution 2011-80 and incorporated all of the terms of 2005-286.  Resolution 2016-73

18  extended the term and increased the fees, but made no other changes to the previous two

19  resolutions."

20  **City Opens Rotation to Add Seventh Tower; Pepe's Applies and is Rejected**

21  **Because Its Outdoor Storage Yard is Less Than 65,000 Square Feet**

22      80.    On March 7, 2018 the San Bernardino City Council adopted Resolution

23  No. 2018-65 authorizing addition of a new rotation tow contractor to the contract tow

24  rotation.  Resolution No. 2018-65 was filed concurrently with this Complaint as

25  Exhibit 5.

26      81.    Pepé's Towing applied for a contract as the seventh tower.  Pepé's Towing

27  obtained the Request for Proposal packet made available by the City of San Bernardino

28  and completed the application.  The Request for Proposal packet established a list of

16

criteria by which the City would evaluate the candidates for the seventh position on the tow rotation. The Request for Proposal process was a specific procedure by which the City minimized its discretion. The Request for Proposals was filed concurrently with this Complaint as Exhibit 6. The deadline for submissions to the City was March 21, 2018.

82. At that time, four of the six existing rotation tow contractors lacked outside storage yards of at least 65,000 square feet. Armada Towing, having bought Big Z Autoworks, now had at least 65,000 square feet, as did Tri-City Towing.

83. At that time, none of the six rotation contract towers had impermeable surfaces covering its exterior storage yards. As noted above, discharges from standing vehicles onto unpaved surfaces violate City of San Bernardino Municipal Code §§ 13.32.305 (M) and 13.32.305 (X). Parking vehicles on an unpaved surface violates City of San Bernardino Municipal Code §§ 10.16.240 and 10.16.250. This conduct also violated Paragraph 3(a) of the tow service agreements. This was also a violation of Resolution No. 2005-286, as amended.

84. Other than Pepé's, there was one other applicant for the open position. It was rejected for reasons not publicly revealed.

85. By means of a letter dated April 17, 2018, signed by City of San Bernardino Police Captain Paul Williams under the printed signatory name of Jarrod Burguan, Chief of Police, the City of San Bernardino informed Pepé's Towing that its application to be added to the City's towing rotation list was rejected because its "Minimum outdoor storage is less than the required 65,000 feet."

86. Pepé's appealed its rejection as the seventh tower and the City's refusal to drop existing rotation towers that were in breach of their contracts to the City Council.

87. A quasi-judicial appeal hearing was convened on July 18, 2018 before the City Council and Mayor.

88. No action was taken at the July 18, 2018 City Council meeting. The appeal hearing was continued to the next City Council meeting in order to give City staff additional time to study the issues raised and report back.

1388656.2

89.     One of the issues City staff was to report on was the reason for the rule requiring only new tow carriers to maintain a 65,000 square foot outside storage yard.

90.     On August 1, 2018 the City Council reconvened the appeal hearing.

91.     The City Council voted to deny Pepé's appeal to replace an existing rotation tow contractor or be chosen as the seventh rotation tow contractor, citing the fact that Pepé's did not have an outside storage yard of at least 65,000 square feet.

**Defendants Have Offered Only Pretextual Bases for the 65,000 Square Foot Requirement, Never Providing Any Rational Basis**

92.     At the July 18, 2018 hearing Pepé's pointed out to the City Council and Mayor that the 65,000 square foot outside yard size requirement not only had no rational basis, but had never been applied to the current 6 rotation tow contractors, with no adverse results. Four of the six existing rotation tow contractors failed the requirement of having 65,000 square feet of outdoor space. For the two that had 65,000 square feet, that fact had not been a condition in their approval as rotation contract towers.

93.     As Pepé's pointed out at the August 1, 2018 hearing, the representative of the Police Department at the hearing conceded that no public safety or welfare issues had been created by the less-than-65,000 square feet of storage capacity maintained by four of the six existing towers. The Police Department representative admitted the City had available to it adequate storage space for city tows. The representative conceded there were no reports of any issues regarding tows being turned away from any of the aforementioned towers due to lack of storage space.

94.     The only justification for the requirement that new rotation tow contractors, but not the existing rotation tow contractors, maintain 65,000 square foot outside storage yards that has ever been set forth by the City was offered by the City Manager and the Police Chief: "The requirement of 65,000 square feet of outside storage space was negotiated with the tow carriers in Resolution Nos. 2011-65 and 2016-65. In order to change this requirement, the City would have to get the consent of each of the existing tow carriers. This binding contract terminates on April 4, 2021."

TUCKER ELLIS LLP

Chicago ◆ Cleveland ◆ Columbus ◆ Houston ◆ Los Angeles ◆ San Francisco ◆ St. Louis

COMPLAINT

1388656.2

TUCKER ELLIS LLP

Chicago ♦ Cleveland ♦ Columbus ♦ Houston ♦ Los Angeles ♦ San Francisco ♦ St. Louis

95.     This contention is patently false and likely pretextual.  Review of the contracts with existing rotation tow contractors reveals no language that requires rotation tow contractors to consent to changes in the Resolutions governing towing in general or with regard to towers not a party to the contract.  The following language, at paragraph 3(a) of the contracts, permits the City to modify its Resolutions:  "Tow Carrier shall also comply with all provisions of the Resolution od the Mayor and Common Council of the City of San Bernardino Establishing Standard Criteria for Companies to Provide Tow Services for the City of San Bernardino as said Resolution exists <u>and/or as said Resolution may be amended from time to time</u>."  (Emphasis added.)

96.     Thus, the City is free to amend its Resolutions, including deleting the 65,000 square foot outside yard requirement for new rotation tow contractors, and the fact that this freedom is explicitly stated in the applicable resolutions shows the irrational and pretextual nature of the City's only basis for supporting the requirement.

97.     In reality, the requirement that a new rotation tow contractor maintain a minimum outdoor storage lot size of 65,000 square feet when the existing rotation tow contractors do not need to meet this requirement is not rationally related to any legitimate government objective because 65,000 square foot outdoor storage lot is not necessary for a tower to discharge its duties under a tow contract with the City of San Bernardino.

98.     Since at least 1995, the applicable Resolutions and contracts have always required outdoor storage space sufficient to store 200 vehicles.  The City has never required its tow contractors to store more than 200 vehicles at a time, and there is virtually no prospect that this will change.  It is possible to store 200 vehicles on a lot much smaller than 65,000 square feet.  For example, according to the City's own document, City Towing, with an exterior storage yard of 23,492 square feet, meets the requirement of outdoor storage space for at least 200 vehicles, as does Wilson Towing with an exterior storage yard area of 29,830 square feet.

99.     The health, safety and welfare of the residents of the city of San Bernardino have been adequately served at least since 1995 by requiring that each rotation tow

19

1388656.2

contractor have facilities sufficient to store 200 vehicles, as provided by Resolution No. 95-241.

100.   No one associated in any way with the City, nor any tow contractor, has ever articulated a rational basis related to any legitimate governmental objective for the requirement that new tow carriers maintain 65,000 square feet of outdoor storage area. No formal findings of fact have ever been adopted which articulate the reason for the 65,000 square foot outside storage requirement.   At the City Council hearing on Pepé's appeal no City representative or member of the public could provide a reason for the 65,000 square foot outside storage yard requirement.   The City manager admitted she did not know why the requirement was instituted.

101.   Pepé's knows of no other governmental agency, and it is on the tow rotations of many, that requires its rotation tow contractors to maintain outdoor storage facilities even approaching 65,000 square feet in size.

102.   In 2011, the City dropped the requirement that a purchaser of one of the existing rotation tow contractors would need to meet the 65,000 square foot requirement in order to be allowed to assume the existing rotation tow contract.   Had there truly been a need to increase the amount of vehicle storage by the towers, the City would have retained this requirement that buyers of existing rotation tow contractors have 65,000 square foot outdoor yards in order to assume the existing contracts.

103.   In deliberately ignoring the evidence Pepé's presented of the existing rotation tow contractors' noncompliance, accepting the Police Department's previous assertions that all then-current rotation tow contractors fully complied with all their contractual requirements, and in rejecting Pepé's challenge that the 65,000 square foot outside yard requirement lacked any rational basis, the City Council denied equal protection and free speech protection to Pepé's.   The City's apparent determination to deny Pepé's a position on the tow rotation at any cost is retaliatory conduct, payback for Pepé's embarrassing the City by pointing out all the ways in which the existing rotation tow contractors have violated the terms of their contracts for years with impunity.   All the

TUCKER ELLIS LLP

Chicago ♦ Cleveland ♦ Columbus ♦ Houston ♦ Los Angeles ♦ San Francisco ♦ St. Louis

COMPLAINT

1388656.2

1   previous conduct of City employees contributed to this denial, and the previous acts were

2   denials on their own, but this was the final denial, the final conspiratorial act of all

3   Defendants.

## First Claim

### Violation of Equal Protection under Fourteenth Amendment, U.S. Constitution; 42 U.S.C. § 1983; and Article 1, § 7, California Constitution

### Against All Defendants

8   104.   Plaintiff incorporates paragraphs 1 to 103 by reference as if fully set forth

9   herein.

10   105.   Defendants' denial of Pepé's application to become the seventh tower in the

11   rotation because it did not have a 65,000 square foot outdoor yard was an action in which

12   Defendants intentionally and without rational basis, treated Plaintiff differently from

13   others similarly situated, the six existing rotation tow contractors.  Pepé's had a right to

14   have its application weighed fairly, on an equal basis with existing rotation tow

15   contractors, and without inclusion of requirements that had no rational basis and did not

16   apply equally to existing rotation tow contracts and candidates to join the rotation.

17   106.   Defendants applied the 65,000 square foot outside yard size requirement to

18   Plaintiff, but has never applied the 65,000 square foot requirement to the six existing

19   rotation tow contractors, without any legitimate basis for differentiating between Pepé's

20   and the six existing rotation tow contractors.

21   107.   Plaintiff and the six rotation tow contractors are, in all relevant respects,

22   similarly situated.

23   108.   Defendants purportedly acted under color of law pursuant to the City of San

24   Bernardino Municipal Code and the City of San Bernardino Charter, Resolution Nos.

25   2018-65, 2016-73, 2011-91, 2011-80, and 2005-286, as well as other City Council

26   Resolutions and the contracts based on those Resolutions.

27   109.   Defendants' actions intentionally violated clearly established constitutional

28   rights of which a reasonable person would have known.

TUCKER ELLIS LLP

Chicago ♦ Cleveland ♦ Columbus ♦ Houston ♦ Los Angeles ♦ San Francisco ♦ St. Louis

21

1388656.2

110.   This denial of equal protection, by means of enforcing disparate treatment requiring 65,000 square feet of outdoor storage yard space on Pepe's but not enforcing the same requirements against the six existing rotation tow contractors, was the official policy of the City of San Bernardino, intentionally carried out and/or ratified by individual Defendants including Police Captain Paul Williams, Police Chief Jarrod Burguan, Chief Deputy City Attorney Jolena Grider, City Attorney Gary Saenz, City Manager Andrea Miller, former City Manager Mark Scott, Mayor R. Carey Davis, and the City Council member Defendants Marquez, Barrio, Valdivia, Shorett, Richard, and Mulvihill.

111.   These Defendants' acts and ratification decisions were conscious and deliberate choices to follow courses of action from among various alternatives.  These acts and ratification decisions were made intentionally with the knowledge that enforcement of the 65,000 square foot outside yard requirement on Pepe's but not on the six existing rotation tow contractors violated Pepe's right to equal protection under the law.

112.   As a result of Defendants' actions, Plaintiff suffered monetary damages, loss of business, loss of employment, and additional damage according to proof.

113.   Defendants' actions were motivated by evil motive or intent, and/or involved reckless or callous indifference to Plaintiff's federally protected rights.

### Second Claim

### Violation of Protection of Free Speech under First Amendment, U.S. Constitution; 42 U.S.C. § 1983; and Article 1, § 2, California Constitution

### Against All Defendants

114.   Plaintiff incorporates paragraphs 1 to 113 by reference as if fully set forth herein.

115.   Defendants purportedly acted under color of law pursuant to the City of San Bernardino Municipal Code and the City of San Bernardino Charter, Resolution Nos. 2018-65, 2016-73, 2011-91, 2011-80, and 2005-286, as well as other City Council

22

COMPLAINT

TUCKER ELLIS LLP

Chicago ♦ Cleveland ♦ Columbus ♦ Houston ♦ Los Angeles ♦ San Francisco ♦ St. Louis

TUCKER ELLIS LLP

Chicago ♦ Cleveland ♦ Columbus ♦ Houston ♦ Los Angeles ♦ San Francisco ♦ St. Louis

Resolutions and the contracts based on those Resolutions.  The City's practices with respect to retaliation against Pepe's for its exercise of free speech amounted to an official policy.

116.   Plaintiff presented information to the City of San Bernardino on multiple occasions documenting the fact that the six existing towers were not in compliance with the terms of their contracts with the City.

117.   Plaintiff presented this information because Plaintiff reasonably believed that if existing towers had violated their contracts, the City would void the contracts and open the contract tow rotation list up for application by additional tow contractors. Plaintiff knew that Pepé's met all the requirements for a towing contract, as specified under Resolution 2005-286 as amended.  Pepé's knew that none of the six existing towers met the requirements for perimeter security, lighting, and impenetrable pavement.

118.   Despite Pepé's presentation of incontrovertible photographic evidence of the lack of compliance by the six existing contractors to City officials, the Police Department professed that it had conducted inspections and that all six of the yards complied with all contractual requirements.  The Police Department denied Pepé's request to declare the existing towers in breach of their contracts.

119.   When Pepé's presented this information to the City, it was exercising its constitutionally protected freedom of speech and expression.

120.   Defendants retaliated against Plaintiff for exercising its protected right to free speech and expression, which it exercised in publicizing the fact that Defendants had long known that the six rotation tow contractors were not complaint with their contracts in many material respects including failing to meet the security requirements and violating the city, state, and federal environmental laws and regulations by failing to park the stored vehicles on impermeable surfaces.  This retaliation came in the form of the City's denial of Plaintiff's application to fill the new rotation tow contractor provision by applying a different standard to Plaintiff than it applies to the existing rotation tow contractors, the requirement of an outside yard of at least 65,000 square feet.  Plaintiff's

23

1388656.2

protected speech was a substantial or motivating factor in Defendants' actions taken against Plaintiff as alleged herein.

121.   This retaliatory denial of free speech protection, by means of refusing to diligently inspect the six existing rotation contract towers for contractual compliance, which had the effect of denying Pepe's the opportunity to fairly compete for these contracts, and by means of requiring 65,000 square feet of outdoor storage yard space on Pepe's but not enforcing the same requirements against the six existing rotation tow contractors, was the official policy of the City of San Bernardino, intentionally carried out and/or ratified by individual Defendants including Police Captain Paul Williams, Police Chief Jarrod Burguan, Chief Deputy City Attorney Jolena Grider, City Attorney Gary Saenz, City Manager Andrea Miller, former City Manager Mark Scott, Mayor R. Carey Davis, and the City Council member Defendants Marquez, Barrio, Valdivia, Shorett, Richard, and Mulvihill.

122.   These Defendants' acts and ratification decisions were conscious and deliberate choices to follow courses of action from among various alternatives.  These acts and ratification decisions were made intentionally with the knowledge that enforcement of the 65,000 square foot outside yard requirement on Pepe's but not on the six existing rotation tow contractors constituted retaliation for Pepe's exercise of its protected free speech rights under the law.  It should have been obvious to Defendants that the City's official policy was likely to result in a deprivation of Pepe's right to protected free speech.

123.   Defendants' retaliatory actions would chill or silence a person of ordinary firmness from future First Amendment activities.

124.   The City and individual Defendants, individually and acting in their official capacities, deprived Plaintiff of its rights.  Defendants' actions inflicting injury are based on either an explicitly adopted or tacitly authorized City policy.

125.   Defendants' actions violated clearly established constitutional rights of which a reasonable person would have known.

1388656.2

126.   As a result of Defendants' actions, Plaintiff suffered monetary damages, loss of business, loss of employment, and additional damage according to proof.

127.   Defendants' actions were motivated by evil motive or intent, and/or involved reckless or callous indifference to Plaintiff's federally protected rights.

### Third Claim

### Violation of 42 U.S.C. § 1985(3)

### Against All Individual Defendants

128.   Plaintiff incorporates paragraphs 1 to 127 by reference as if fully set forth herein.

129.   The Individual Defendants purportedly acted under color of law pursuant to the City of San Bernardino Municipal Code and the City of San Bernardino Charter, Resolution Nos. 2018-65, 2016-73, 2011-91, 2011-80, and 2005-286, as well as other City Council Resolutions and the contracts based on those Resolutions.

130.   Defendants, acting individually and in their official capacities, intentionally conspired to deprive Plaintiff of its statutory and constitutional rights as alleged herein. Each Defendant either knew of the other Defendants' plan to deprive Plaintiff of its statutory or constitutional rights as alleged herein, agreed to participate in that conspiracy, or shared in the common objective of that conspiracy.

131.   Defendants' acts were in furtherance of the conspiracy, and Defendants' invidiously discriminatory animus was behind Defendants' actions.

132.   The individual Defendants who carried out this conspiracy were Police Captain Paul Williams, Police Chief Jarrod Burguan, Chief Deputy City Attorney Jolena Grider, City Attorney Gary Saenz, City Manager Andrea Miller, former City Manager Mark Scott, Mayor R. Carey Davis, and the City Council member Defendants Marquez, Barrio, Valdivia, Shorett, Richard, and Mulvihill.

133.   The conspiracy was aimed at interfering with Plaintiff's protected rights such as the right to equal protection and free speech.

134.   Defendants' acts were taken under the color of state law.

25

COMPLAINT

TUCKER ELLIS LLP

Chicago ♦ Cleveland ♦ Columbus ♦ Houston ♦ Los Angeles ♦ San Francisco ♦ St. Louis

1388656.2

135.   Defendants' actions violated clearly established statutory or constitutional rights of which a reasonable person would have known.

136.   As a result of Defendants' actions, Plaintiff suffered monetary damages, loss of business, loss of employment, and additional damage according to proof.

137.   Defendants' actions were motivated by evil motive or intent, and/or involved the reckless or callous indifference to Plaintiff's federally protected rights.

### Fourth Claim

### Violation of 42 U.S.C. § 1986

### Against All Individual Defendants

138.   Plaintiff incorporates paragraphs 1 to 137 by reference as if fully set forth herein.

139.   Defendants purportedly acted under color of law pursuant to the City of San Bernardino Municipal Code and the City of San Bernardino Charter, Resolution Nos. 2018-65, 2016-73, 2011-91, 2011-80, and 2005-286, as well as other City Council Resolutions and the contracts based on those Resolutions.

140.   Defendants, by being presented with information by Plaintiff, hearing or participating in meetings with other Defendants, and being privy to other information about Defendants' actions and contemplated actions involving Plaintiff, had knowledge that some or all of the wrongs conspired to be done were about to be committed, and had the power to prevent or aid in preventing the commission of those acts, but neglected or refused to do so.

141.   The individuals who engaged in this wrongful conduct were Police Captain Paul Williams, Police Chief Jarrod Burguan, Chief Deputy City Attorney Jolena Grider, City Attorney Gary Saenz, City Manager Andrea Miller, former City Manager Mark Scott, Mayor R. Carey Davis, and the City Council member Defendants Marquez, Barrio, Valdivia, Shorett, Richard, and Mulvihill.  These Defendants acted individually and in their official capacities.

TUCKER ELLIS LLP

Chicago ♦ Cleveland ♦ Columbus ♦ Houston ♦ Los Angeles ♦ San Francisco ♦ St. Louis

COMPLAINT

1388656.2

142.   Defendants' actions violated clearly established statutory or constitutional rights of which a reasonable person would have known, as alleged herein.

143.   As a result of Defendants' actions and failure to act despite having the power to do so, Plaintiff suffered monetary damages, loss of business, loss of employment, and additional damage according to proof.

144.   Defendants' actions were motivated by evil motive or intent, and/or involved the reckless or callous indifference to Plaintiff's federally protected rights.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Pepé's Towing ("Plaintiff") prays for relief and judgment against Defendants City of San Bernardino ("City") and the individual Defendants in their personal capacities as follows:

## **FIRST CLAIM FOR RELIEF**

1.   For a declaratory judgment declaring that all contracts currently in effect between the City of San Bernardino and towing contractors and the operative Resolutions governing those contracts, on their face and as applied by Defendants, are unlawful, void, and unenforceable because they violate the Equal Protection Clause;

2.   A permanent injunction or temporary injunction/restraining order prohibiting Defendants from enforcing or attempting to enforce the contracts and operative Resolutions;

3.   For an order that the City of San Bernardino shall design a process by which it will request proposals from all towing companies interested in contracting with the City to be part of its towing rotation, and that it shall implement the process in a manner that evaluates the capabilities, facilities, equipment, and personnel of the six towers currently contracted with the City using the same criteria by which it evaluates new towers, with no credit of any kind given to the fact that these six towers have an established relationship with the City.

4.   For general and special damages according to proof;

TUCKER ELLIS LLP

Chicago ♦ Cleveland ♦ Columbus ♦ Houston ♦ Los Angeles ♦ San Francisco ♦ St. Louis

COMPLAINT

1388656.2

5.      For punitive damages against the individual Defendants in their personal capacities;

6.      For an award of attorneys' fees under 42 U.S.C. § 1998, Cal. Code of Civil Procedure § 1021.5, and/or any other applicable provision of law;

7.      Costs, interest, and such other and further appropriate relief that the Court deems just and proper.

## SECOND CLAIM FOR RELIEF

1.      A declaratory judgment declaring that all contracts currently in effect between the City of San Bernardino and towing contractors and the operative Resolutions governing those contracts, on their face and as applied by Defendants, are unlawful, void, and unenforceable because they violate the Equal Protection Clause;

2.      A permanent injunction or temporary injunction/restraining order prohibiting Defendants from enforcing or attempting to enforce the contracts and operative Resolutions;

3.      An order that the City of San Bernardino shall design a process by which it will request proposals from all towing companies interested in contracting with the City to be part of its towing rotation, and that it shall implement the process in a manner that evaluates the capabilities, facilities, equipment, and personnel of the six towers currently contracted with the City using the same criteria by which it evaluates new towers, with no credit of any kind given to the fact that these six towers have an established relationship with the City.

4.      General and special damages according to proof;

5.      Punitive damages against the individual Defendants in their personal capacities;

6.      An award of attorneys' fees under 42 U.S.C. § 1998, Cal. Code of Civil Procedure § 1021.5, and/or any other applicable provision of law;

7.      Costs, interest, and such other and further appropriate relief that the Court deems just and proper.

TUCKER ELLIS LLP

Chicago ♦ Cleveland ♦ Columbus ♦ Houston ♦ Los Angeles ♦ San Francisco ♦ St. Louis

28

1388656.2

TUCKER ELLIS LLP

Chicago ♦ Cleveland ♦ Columbus ♦ Houston ♦ Los Angeles ♦ San Francisco ♦ St. Louis

## THIRD CLAIM FOR RELIEF

1.  General and special damages according to proof;

2.  Punitive damages against the individual Defendants in their personal capacities;

3.  An award of attorneys' fees under 42 U.S.C. § 1998, Cal. Code of Civil Procedure § 1021.5, and/or any other applicable provision of law;

4.  Costs, interest, and such other and further appropriate relief that the Court deems just and proper.

## FOURTH CLAIM FOR RELIEF

1.  General and special damages according to proof;

2.  Punitive damages against the individual Defendants in their personal capacities;

3.  An award of attorneys' fees under 42 U.S.C. § 1998, Cal. Code of Civil Procedure § 1021.5, and/or any other applicable provision of law;

4.  Costs, interest, and such other and further appropriate relief that the Court deems just and proper.

DATED:  October 24, 2018                    Tucker Ellis LLP


By:     /s/ William H. Dance
        _____
        Carmen A. Trutanich
        carmen.trutanich@tuckerellis.com
        William H. Dance
        william.dance@tuckerellis.com
        Attorneys for Plaintiff
        PEPE'S, INC., a California
        corporation dba Pepé's Towing
        Service

COMPLAINT

1388656.2

# DEMAND FOR JURY TRIAL

In accordance with Local Rule 38-1, Plaintiff Pepé's, Inc. demands a trial by jury on all claims for which a jury trial is provided under law.

DATED:  October 24, 2018                    Tucker Ellis LLP


By:     /s/ William H. Dance
_____
Carmen A. Trutanich
carmen.trutanich@tuckerellis.com
William H. Dance
william.dance@tuckerellis.com
Attorneys for Plaintiff  PEPE'S,
INC., a California corporation dba
Pepé's Towing Service

COMPLAINT

1388656.2